## HARRY GIDLEY, Appellant, v. GEORGE H. GLASS, Respondent.

### (171 N. W. 93.)

**Statute of Frauds — collateral promise.**

> In an action brought to charge the defendant for goods delivered to a third person, where the plaintiff testified that the defendant told him that he would see that he, the plaintiff, got his pay, the goods being charged to the third person to whom they were delivered, the evidence examined, and
>
> *Held,* to establish a promise to pay for the debt, default, or miscarriage of another within the Statute of Frauds.

Appeal from a judgment of the District Court of Renville County, *Leighton, J.*

Affirmed.

*E. R. Sinkler, J. E. Bryans,* and *M. O. Eide,* for appellant.

"The party making motion for judgment notwithstanding the verdict must base it upon a state of facts that will warrant the court in granting it without trespassing upon the juries' province to be judges of all the facts in the case." Ætna Indemnity Co. v. Schroeder, 12 N. D. 110; Nelson v. Grondahl, 12 N. D. 130; Meehan v. Great Northern R. Co. 13 N. D. 432; Houghton Implement Co. v. Vavrowski, 15 N. D. 308.

"Where a substantial conflict exists, and there is sufficient testimony, if true, to justify the verdict, the court will not set it aside." Leistikow v. Zuelsdorf, 18 N. D. 511.

"The promise of one party to pay another party for goods delivered by such second party to a third party is an original promise, and not within the Statute of Frauds. Parting with the goods furnished the consideration to support the promise." Grand Forks Lumber Co. v. Tourtelot, 7 N. D. 587.

"To ascertain whether undertaking to pay debt of another be col-

NOTE.—Authorities discussing the question whether a promise to pay the debt of another created contemporaneously with the promise is within the Statute of Frauds are collated in notes in 15 L.R.A.(N.S.) 214, and 32 L.R.A.(N.S.) 598, on contemporaneous promise of one person to pay where benefit inures to another as a promise to answer for the default of another within the Statute of Frauds.

lateral or original, the point of inquiry is, to whom was the credit given at the time of the sale and delivery of the goods?" Larson v. Janson (Mich.) 19 N. W. 130; Keeler v. Cheadle (Okla.) 72 Pac. 367; Harris v. Frank, 22 Pac. 858.

*Henry G. Middaugh, Rollo F. Hunt,* and *Albert E. Coger,* for respondent.

"The agreement and correspondence between the parties is pertinent, it should be controlling." Hart v. Ten Eyck, 2 Johns, Ch. 82.

"A promise upon which the statute declares no action can be maintained cannot be made effectual merely because it has been acted upon by the person to whom the promise was made, and not performed by the promisor." Brightman v. Hicks, 108 Mass. 246; Grand Forks Lumber Co. v. Tourtelot, 7 N. D. 587, 75 N. W. 901; note in 15 L.R.A. (N.S.) 214 to 227; Wood v. Dodge, 23 S. D. 95, 120 N. W. 774.

"Will see you paid," is a collateral promise." England-Matson v. Wharam, 2 T. R. 80. See also Peckham v. Faris, 3 Dougl. 13; Wagner v. Hallack, 3 Colo. 183; Jenkins, etc. Co. v. Lundgreen, 85 Ill. App. 494; Thwaits v. Curl, 6 B. Mon. 472; Blake v. Perlin, 22 Me. 395; Doyle v. White, 26 Me. 341; Cropper v. Pittman, 13 Md. 190; Meyer v. Grafflin, 31 Md. 350; Hill v. Raymond, 3 Allen, 540; Stone v. Walke, 13 Gray, 613; Nelson v. Boynton, 3 Met. 400; Cahill v. Bigelow, 18 Pick. 369; Swigart v. Gentert, 63 Neb. 157; Birchell v. Neaster, 36 Ohio St. 331; Nugent v. Wolfe, 111 Pa. 481; Skinner v. Conant, 2 Vt. 453; Blodgett v. Lowell, 33 Vt. 174.

"5. 'Will pay if he does not.' Collateral." Jones v. Cooper, 1 Cowp. 227; Warner v. Willoughby, 60 Conn. 468; Baldwin v. Biers, 73 Ga. 740; Reggie v. Smith, 87 Ill. App. 141; Schotte v. Puscheck, 79 Ill. App. 31; Conolly v. Kettlewell, 1 Gill, 260; Nelson v. Boynton, 3 Metc. 400; Grant v. Wolf, 34 Minn. 32; Dufolt v. Gorman, 1 Minn. 301; Allen v. Scarff, 1 Hilt, 209; Rawlinson v. Springsteen, 2 Thomp. & C. 416; Newcomb v. Clark, 1 Den. 226; Knox v. Nutt, 1 Daly, 213; Garrett-Williams Co. v. Hamill, 131 N. C. 57; Loftus v. Ivy, 14 Tex. Civ. App. 701; Steele v. Towner, 28 Vt. 771; Aldrich v. Jewel, 12 Vt. 125.

"6. 'Will guarantee,' etc. Collateral." Kinloch v. Brown, 2 Speers, L. (S. C.) 284; Butters, Salt, etc., Co. v. Vogel, 130 Mich. 33; Walker v. Richards, 41 N. H. 388; Norris v. Graham, 33 Md. 56; Dovenmuehle v. Milenberger, 70 Ill. App. 180.

BIRDZELL, J. This action was brought to recover for goods alleged to have been sold to the defendant and upon his credit, but delivered to one Averil at defendant's request. The action was tried in the district court of Renville county and a verdict rendered for the plaintiff. Upon a motion for a judgment *non obstante,* the verdict was set aside and the plaintiff appeals.

The theory upon which defendant's motion was allowed was that the evidence showed that if any promise was made by the defendant to pay for the goods delivered to Averil, it resulted in an obligation collateral to that of Averil, and as such was a promise to pay for the debt, default, or miscarriage of another, within the meaning of the Statute of Frauds. Comp. Laws 1913, §§ 5888 and 6655.

The question presented is one of the sufficiency of the evidence to establish an original undertaking by the defendant. A careful examination of the facts is essential to a proper determination of the case. The plaintiff was engaged in the farm implement business at Glenburn. The defendant owned several quarter sections of land in that vicinity, which he rented to tenants. After renting some of his land to Averil on shares, the latter came to Glenburn for the purpose of beginning his tenancy, and arranged with the plaintiff to obtain certain machinery on credit. At the time he represented that the defendant Glass would stand good for the machinery, and it seems the plaintiff charged some items to the tenant and Glass jointly. (The plaintiff makes no claim for the recovery of these items in this action.) Later, however, the defendant came to Glenburn, and the alleged contract for the sale, as testified to by the plaintiff, was made.

The only evidence upon which the plaintiff's judgment can rest consists of his own testimony, his correspondence, and his book accounts.


The plaintiff testified concerning the transactions as follows:

Q. And Mr. Averil came and got prices from you, told you what he wanted and you had agreed to let him have the stuff?

A. With Mr. Glass going good for it, which Mr. Averil gave me to understand in the first place that he would.

Q. Averil told you that Glass would go good for it?

A. Yes, sir.

Q. Only these first two items were delivered before you saw Glass?

A. Yes, sir.

Q. The first item of $133.50, the second for $196.00, making a total of $329.50, was credit you extended to Averil before you had any talk with Glass at all?.

A. Yes, sir.

Q. Now, goods to that amount were actually delivered to Mr. Averil before this talk with Glass, were they not?

A. Yes, sir.

[The items above referred to are not involved in this suit, but the testimony is reproduced for its bearing upon the understanding with respect to the items here involved.]

I first saw Mr. Glass on or about March 2d.

Q. And it was at that time that Mr. Glass told you to let Averil have anything he wanted? Did he use those words?

A. He told me to *sell him the goods and he would see that I got my pay for it—for them.*

Q. (Referring to a note and mortgage Gidley took from Averil.) I mean didn't you tell Glass that Averil said Glass would sign those papers?

A. Averil told me that Glass was going good for them—for all this stuff.

Q. What did you tell him?

A. Mr. Averil told me that Glass was going good for all these goods, and when I asked Mr. Glass, he said, "All right."

Q. Did he object to signing a note and mortgage?

A. Yes, because if I asked him to he didn't sign it.

Q. Didn't you ask him to sign a note and mortgage, and didn't he tell you he wouldn't sign a note and mortgage, and wasn't that the first conversation you had with him?

A. Yes, I think he did.

Q. Now, you took another mortgage the next year from Mr. Averil, didn't you?

A. I think so.

Q. You never thought of asking him to sign that, did you?

A. Why, I took him at his word. *He told me that he would see that I got my pay and I took him at his word.*

41 N. D.—35.

Q. Did you send Mr. Glass any statements?

A. I don't think so after these letters I wrote him.

Q. Were those letters the only communications that you had by mail with Mr. Glass.

A. I think they were.

[The following testimony relates to some paper given by Averil for McCormick machinery which was turned over to the International Harvester Company by Gidley.]

Q. Did you tell the McCormick people when you turned that paper over to them that Mr. Glass was a guarantor on it?

A. I don't think I did.

Q. You are certain you didn't, aren't you, Mr. Gidley?

A. That certain paper, that separate paper, that was commission paper. *That stuff I understood I was to have a guaranty on was my personal stuff.*

[The record shows that Glass had ordered some harness for Averil to use, but on account of its not arriving in time other harness had to be purchased, and that when the harness to be supplied by Glass arrived it was turned over to Gidley. The following testimony tends to show what the understanding was regarding credit for the harness, and it also reflects Gidley's understanding as to the nature of Glass's alleged obligation.]

Q. And Mr. Glass brought this harness up to you and told you that he had intended it for Averil's use, but didn't come in time and wanted you to take it over?

A. I think that was it.

Q. Now, was that at the same time you had this talk where you say he told you he would see you were paid?

A. The time he turned the harness over to me?

Q. Yes.

A. It was along about that time. I don't know whether it was the same time or not, but he says I have got this harness and I will turn them over to you.

Q. Go ahead?

A. *And if Mr. Averil don't pay you, you will have that much on the deal.*

Q. Didn't he say, "I will turn this harness over to you, and when Averil pays you you can pay me?

A. Yes, sir.

Q. That is what he said?

A. Yes, when Averil paid me I could pay him.

In the plaintiff's ledger Glass is credited with the value of the harness, amounting to $231, and the following memorandum appears in connection with the credit: "*To be paid when Averil has paid me in full.*"

The plaintiff testified further: "When I couldn't collect my money, that was my understanding, *I was to take those harness, and if Mr. Averil didn't pay me then those harness was to apply on the debt.*"

It seems that in 1912 the plaintiff and defendant entered into a mutual agreement whereby the defendant agreed to relinquish his prior crop mortgage upon Averil's share of the crop to enable the plaintiff to obtain a prior lien thereon for the book account.

In a letter written by the plaintiff on March 18, 1912, he said: "Am writing you regarding our deal with Mr. Averil. He has not paid me any money out of the 1911 crop, and, as you know, he didn't pay me any in 1910. I feel that I am entitled to some cash, for you have been in business and know that a man must collect some money or he cannot continue to do business. Of course *I know it is good for you have guaranteed the payments.* But I need some money, and think I am entitled to some from this deal. When I asked Mr. Averil for money this winter he said he hadn't hauled his grain yet and wouldn't freeze himself hauling grain for any man, and acted as though he thought I didn't have no business to talk to him about money."

Again on March 29, 1912, plaintiff wrote as follows: "You told me that you would see that I got my pay for the goods. You said you may have to carry part of it, but you would see that I got my money. *This surely is a guaranty.* I have carried this for two years and *he has never paid me a dollar.*"

The foregoing evidence establishes beyond doubt that in the transactions between the plaintiff and Averil the plaintiff regarded Averil as the principal debtor and looked to the defendant merely as a guarantor. While the plaintiff, during the latter part of his testimony, stated that

he didn't look to Averil at all and didn't regard him as being indebted to him, nevertheless, when his whole testimony is considered, in the light of the transactions and the book entries, it cannot be doubted that he did regard Averil as indebted to him for the full amount of the account. We are of the opinion that the plaintiff's own testimony shows a promise within the Statute of Frauds.

The appellant relies upon the case of Leistikow v. Zuelsdorf, 18 N. D. 511, 122 N. W. 340. This case does not support the appellant's contention. There was abundant testimony in the Leistikow Case to the effect that the plaintiff did not know Rolcynzinski, to whom the goods were delivered, and that he would not charge the goods to him, also such goods were ultimately charged to Rolcynzinski at the request of Zuelsdorf, the defendant. There is much testimony going to show that the goods in that case were bought by the defendant himself and were charged to Rolcynzinski at the request of the defendant as a matter of convenience between the defendant and Rolcynzinski. There is no evidence of any such understanding in this case.

The judgment appealed from is affirmed, with costs.

GRACE, J., disqualified, CRAWFORD, District Judge, sat in his stead.